UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JULIUS BRADFORD,<br><br>    Petitioner,<br><br>    v.<br><br>CALVIN JOHNSON, *et al.*,<br><br>    Respondents. | Case No. 2:13-cv-01784-RFB-EJY<br><br>**ORDER** |

## I. <u>Introduction</u>

This action is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by Julius Bradford, an individual incarcerated at Nevada's High Desert State Prison. Bradford is represented by appointed counsel. He is serving prison sentences that in their aggregate amount to life with the possibility of parole after forty years on convictions in Nevada's Eighth Judicial District Court (Clark County) of murder with use of a deadly weapon and attempted robbery with use of a deadly weapon. Bradford's second amended habeas petition is before the Court for adjudication of his claims on their merits. The Court held an evidentiary hearing relative to one of Bradford's claims—Ground 2—and will grant Bradford relief on that claim. The Court will deny Bradford's other claims, without prejudice, as moot.

## II. <u>Background</u>

The following facts are as described in the Second Amended Petition:

> …. On the morning of June 8, 2003, Benito Zambrano-Lopez was walking toward a grocery store near his house [in Las Vegas]. He had just over $100 cash on him and he was wearing a watch. Tyrone Williams, a sixteen-year old, approached Mr. Zambrano-Lopez and started a fight. Two of Mr. Williams' friends, Steven Perry, a seventeen-year old, and Mr.

1

Bradford, who had just turned eighteen, were walking nearby. At some point, they both stepped in to assist Mr. Williams, who was losing the fight. Soon afterward, Mr. Williams pulled out a gun and shot Mr. Zambrano-Lopez four times. Mr. Bradford and Mr. Perry ran away immediately after the first shot was fired, and Mr. Williams followed soon after. None of Mr. Zambrano-Lopez's belongings, including the cash or his watch, were taken from him. Mr. Zambrano-Lopez died the next day, and the state charged Mr. Bradford with felony murder.

* * *

Only one eyewitness testified at trial. Tracy Jimenez testified that she was walking down the street with her young daughter when she saw the three men surround Mr. Zambrano-Lopez, hitting and kicking him. She said that Mr. Zambrano-Lopez fought back to defend himself. She testified that Mr. Williams then pulled out a gun and shot Mr. Zambrano-Lopez, while Mr. Bradford and Mr. Perry immediately fled. At the preliminary hearing, Ms. Jimenez testified she did not see the men try to take anything from Mr. Zambrano-Lopez. At trial five years later, she testified that, after Mr. Bradford had fled, Mr. Williams "pat[ted]" down Mr. Zambrano-Lopez's body.

Two other state's witnesses provided equivocal testimony about what they heard Mr. Williams and Mr. Perry say about the murder. Neither testified that Mr. Bradford said anything about it. Chetique Vercher testified that after the shooting, she was in the same house as Mr. Williams, Mr. Perry, and Mr. Bradford. She testified that the crime was "supposed to be robbery," but did not say that she actually heard anyone say that. She also testified that she heard Mr. Perry say that Mr. Bradford had told Mr. Williams to shoot Mr. Zambrano-Lopez. Nelson Rodgers, a friend of Mr. Bradford's, testified he was in the house with Ms. Vercher and the others after the shooting. Mr. Rodgers testified that he heard Mr. Perry and Mr. Williams talk about a robbery, but that Mr. Bradford was not present during that discussion.

.... [T]he state presented a recorded conversation between Mr. Bradford and Ms. Vercher, which took place shortly before Mr. Bradford's preliminary hearing. During the call, Mr. Bradford told Ms. Vercher to say "nothing about the rees-obbery":

> Look, come to court, right come to court, ah just tell them. Cuz, don't say nothing about the rees-obbery, cuz. Don't say nothing about that, cuz. All right. I am tell you cuz don't because that's what they got me on. That's why they are trying to stick me with the hezour.

Ms. Vercher testified that she understood Mr. Bradford was asking her not to say anything about a robbery. Mr. Bradford testified that he told her not to say anything about a robbery because there had, in fact, been no robbery, and the state was trying to make the fight look like one. Mr. Bradford's former counsel, Sean Sullivan, also testified at trial about the phone call, after counsel convinced Mr. Bradford to waive the attorney-client privilege. Mr. Sullivan testified that, just before Mr. Bradford's call to Ms. Vercher, he met with Mr. Bradford and "broke down" the felony murder rule....

> Ashton Parker, a jailhouse snitch who got a deal in exchange for his testimony, testified about conversations he claimed he had with Mr. Bradford while they were incarcerated in the same module. He testified that Mr. Bradford admitted both that the crime was a robbery and that he directed Mr. Williams to "smoke" Mr. Zambrano-Lopez. Mr. Parker also testified that Mr. Bradford gave him a map to Ms. Vercher's house, and asked him to shoot into Ms. Vercher's house to intimidate her. The state admitted a copy of the map, and other evidence established that Mr. Bradford's fingerprints were on the map and that it matched his handwriting.
>
> To counter the jailhouse informant's allegations, the defense focused on his incentive for lying — a plea deal with the state involving a closed conviction....
>
> .... Although Mr. Bradford confirmed [in his testimony at trial] that neither he nor the other two men tried to rob Mr. Zambrano-Lopez, and testified that he had no idea Mr. Williams intended to shoot Mr. Zambrano-Lopez, his testimony on collateral issues left the jury with the impression that Mr. Bradford was the type of man who deserved to go to prison.
>
> .... Trial counsel elicited an admission that Mr. Bradford had drawn the map and given it to Mr. Parker. While he denied the map actually directed Mr. Parker to Ms. Vercher's house, her address was written on it. Likewise, while Mr. Bradford testified that he was actually giving Mr. Parker directions to his ex-girlfriend's house, which was near Ms. Vercher's, he also testified that he provided the directions so that Mr. Parker could rob her....
>
> .... On cross, the state elicited [evidence] that Mr. Bradford was a gang member who earned his stripes by selling drugs for his gang. The state also played for the jury a surveillance videotape from a 7-11 from an unrelated case, which the state argued depicted Mr. Bradford using an ATM card that he had stolen at gunpoint.

Second Am. Pet. at 2–5, ECF No. 67 (argument and citations to record omitted).

At Bradford's first trial in 2004, the jury found him guilty of murder with use of a deadly weapon and attempted robbery with use of a deadly weapon. On June 3, 2004, the trial court sentenced Bradford to two consecutive life sentences for murder with use of a deadly weapon, with parole eligibility after twenty years, and two consecutive sentences of six years for the attempted robbery with use of a deadly weapon, with parole eligibility after two years, to be served concurrently with the life sentences. See Judgment of Conviction, Ex. 54, ECF No. 25-11.

Bradford appealed, and on April 18, 2006, the Nevada Supreme Court reversed and remanded for a new trial, ruling that the trial court gave the jury improper instructions

3

regarding accomplice and co-conspirator liability as well as adoptive admissions. See Order of Reversal and Remand, Ex. 60, at 2–9, ECF No. 25-17.

On remand, the trial court initially reappointed Sean Sullivan as Bradford's counsel. However, Sullivan notified the court that he had a conflict of interest because he was a potential witness in the retrial, and he was permitted to withdraw. The court then appointed another attorney, Mace Yampolsky, to represent Bradford in the retrial. See Order Appointing Counsel, Ex. 63, at 2, ECF No. 25-20; Tr. of Proceedings, Ex. 65, at 2–15, ECF No. 25-22; Tr. of Proceedings, Ex. 66, at 3–4, ECF No. 25-23; Order Appointing Counsel, Ex. 67, at 2, ECF No. 25-24. At a pretrial hearing on July 27, 2007, Bradford waived the attorney-client privilege as to the subject of Sullivan's testimony and Sullivan testified; his testimony was video recorded. See Tr. of Trial, Ex. 74, ECF No. 25-31.

Bradford's retrial commenced on July 30, 2007. See Tr. of Trial, Exs. 77, 78, 82, 87, 90, ECF Nos. 26, 26-1, 27, 28, 28-3. Bradford was again found guilty of murder with use of a deadly weapon and attempted robbery with use of a deadly weapon. See Tr. of Trial, Ex. 90, at 8, ECF No. 28-3; Verdict, Ex. 94, at 2–3, ECF No. 28-7. He was again sentenced to two consecutive life sentences for murder with use of a deadly weapon, with parole eligibility after twenty years, and two consecutive sentences of six years in prison for the attempted robbery with use of a deadly weapon, with parole eligibility after two years, to be served concurrently with the life sentences. See Tr. of Sentencing Hr'g, Ex. 100, at 5, ECF No. 28-13; Am. J. of Conviction, Ex. 102, at 2–4, ECF No. 28-15.

Bradford appealed from the amended judgment, and the Nevada Supreme Court affirmed on June 30, 2009. See Order of Affirmance, Ex. 111, at 2–12, ECF No. 29-4. Bradford filed a petition for rehearing and a petition for en banc reconsideration, both of which were denied. See Order Den. Rehearing, Ex. 113, at 2, ECF No. 29-6; Order Den. En Banc Recons., Ex. 115, at 2, ECF No. 29-8.

Bradford then filed a Petition for Writ of Habeas Corpus in the state district court. See Pet. for Writ of Habeas Corpus (Post Conviction), Ex. 123, ECF No. 29-18. The state district court denied that petition on May 13, 2011. See Findings of Fact, Conclusions of

Law and Order, Ex. 127, at 3–9, ECF No. 29-22. Bradford appealed, and the Nevada Supreme Court affirmed on July 23, 2013. See Order of Affirmance, Ex. 154, at 2–6, ECF No. 34.

On May 4, 2012, Bradford filed a second Petition for Writ of Habeas Corpus in the state district court. See Petition for Writ of Habeas Corpus (Post-Conviction), Ex. 138, ECF No. 30-3. The state district court dismissed that petition on July 30, 2012, upon a motion by the State, ruling Bradford's claims to be time-barred and successive. See Order Grant'g State's Resp. and Mot. to Dismiss Def's Pet. for Writ of Habeas Corpus (Post-Conviction), Ex. 141, at 2–3, ECF No. 31-2. Bradford appealed, and the Nevada Supreme Court affirmed on October 16, 2014. See Order of Affirmance, Ex. 174, at 2–6, ECF No. 42-3. Bradford filed a petition for rehearing, which was denied. See Order Den. Reh'g, Ex. 186, at 2–3, ECF No. 62-4.

This Court received Bradford's federal Petition for Writ of Habeas Corpus initiating this action on September 27, 2013. ECF No. 1. On December 3, 2013, the Court appointed the Federal Public Defender to represent Bradford. See ECF No. 16. With counsel, Bradford filed an amended habeas petition on August 12, 2014. ECF No. 22. On March 31, 2015, this action was stayed upon a motion by Bradford pending further proceedings in state court. ECF No. 53.

Bradford filed a third state-court habeas petition on August 29, 2014. See Pet. for Writ of Habeas Corpus (Post-Conviction), Ex. 172, ECF No. 42-1. The state district court dismissed that petition on March 25, 2015, upon a motion by the State, ruling Bradford's claims to be time-barred. See Findings of Fact, Conclusions of Law and Order, Ex. 189, at 2–9, ECF No. 62-7. Bradford appealed, and the Nevada Court of Appeals affirmed on July 27, 2016. See Order of Affirmance, Ex. 197, at 2–8, ECF No. 62-15.

The stay of this action was lifted on January 13, 2017, ECF No. 66, and Bradford filed a Second Amended Petition for Writ of Habeas Corpus, ECF No. 67, which is the operative petition in this matter. In the second amended petition, Bradford asserts the following grounds for relief:

Ground 1: Bradford's federal constitutional rights were violated because his trial counsel was ineffective "for presenting inculpatory testimony from Mr. Bradford's former attorney, Sean Sullivan, about a privileged conversation Mr. Sullivan had with Mr. Bradford regarding the felony murder rule."

Ground 2: Bradford's federal constitutional rights were violated because his trial counsel was ineffective "for failing to advise Mr. Bradford that he faced the death penalty if he did not accept the state's plea bargain offers."

Ground 3: Bradford's federal constitutional rights were violated because his trial counsel was ineffective for improperly advising him to testify in his own defense.

Ground 4: Bradford's federal constitutional rights were violated because "[t]he trial court improperly admitted irrelevant and prejudicial evidence that Mr. Bradford was a member of the Crips gang who sold drugs to benefit his gang."

Ground 5: Bradford's federal constitutional rights were violated because his trial counsel was ineffective "for opening the door to the damaging gang affiliation evidence during direct examination."

Ground 6: Bradford's federal constitutional rights were violated because "[t]he trial court improperly admitted a videotape purportedly showing Mr. Bradford using an ATM card he stole at gunpoint."

Ground 7: Bradford's federal constitutional rights were violated because his trial counsel was ineffective "for opening the door to damaging videotape evidence of an unrelated robbery during direct examination."

Ground 8: Bradford's federal constitutional rights were violated because "[t]he trial court failed to provide the jury with a limiting instruction regarding improperly admitted bad act evidence."

Ground 9: Bradford's federal constitutional rights were violated because his trial counsel was ineffective "for failing to request a limiting instruction once he opened the door to damaging bad act evidence."

Ground 10: Bradford's federal constitutional rights were violated because "[t]he trial court failed to accurately describe the elements of murder with a deadly weapon and robbery with a deadly weapon, relieving the prosecution of its burden to prove every element of the charges beyond a reasonable doubt."

Ground 11: Bradford's federal constitutional rights were violated because his trial counsel was ineffective "for failing to ensure the jury received the proper instructions regarding the meaning of 'use of deadly weapon.'"

Ground 12: Bradford's federal constitutional rights were violated because "[t]he trial court failed to properly instruct the jury on adoptive admissions."

Ground 13: Bradford's federal constitutional rights were violated because his trial counsel was ineffective "for failing to request an adequate instruction on adoptive admissions."

6

    Ground 14:  Bradford's federal constitutional rights were violated because his trial counsel was ineffective "for failing to request and review recordings of phone calls of a key prosecution witness."

    Ground 15:  Bradford's federal constitutional rights were violated because "[t]he prosecution withheld material exculpatory evidence that a state [witness] received a material benefit in exchange for his testimony."

    Ground 16:  Bradford's federal constitutional rights were violated because "[t]here was insufficient evidence to support Mr. Bradford's murder with a deadly weapon and [attempted] robbery with a deadly weapon convictions."

    Ground 17:  Bradford's federal constitutional rights were violated as a result of the "cumulative effect of the constitutional errors in his case."

ECF No. 67 at 14–65.

On September 11, 2017, the Respondents filed a Motion to Dismiss, ECF No. 73, and on November 27, 2017, Bradford filed a Motion for Evidentiary Hearing, ECF No. 77. The Court denied both of those motions without prejudice on April 12, 2018, determining that the issues raised in the Motion to Dismiss would be better considered in conjunction with the merits of Bradford's claims after Respondents filed an answer and Bradford a reply. ECF No. 88.

The Respondents filed an Answer on March 25, 2019, ECF No. 98, and Bradford filed a Reply, ECF No. 116, and a further Motion for Evidentiary Hearing, ECF No. 117, on August 7, 2019. The Court granted the Motion for Evidentiary Hearing, with respect to Ground 2, on May 27, 2020. ECF No. 124. The evidentiary hearing was held on June 11, 2021.

**III.**    **Discussion**

    A.    Procedural Default

In Coleman v. Thompson the Supreme Court held that a state prisoner who fails to comply with state-law procedural requirements in presenting his claims is barred by the adequate and independent state ground doctrine from obtaining a writ of habeas corpus in federal court. Coleman v. Thompson, 501 U.S. 722, 731–32 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims

has deprived the state courts of an opportunity to address those claims in the first instance."). Where such a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it. Murray v. Carrier, 477 U.S. 478, 496 (1986).

In this case, on Bradford's direct appeal, and on the appeal in his first state habeas action, the Nevada Supreme Court generally ruled on his claims on their merits. See Order of Affirmance, Ex. 111, ECF No. 29-4; Order of Affirmance, Ex. 154, ECF No. 34. On the other hand, on the appeal in Bradford's second state habeas action, the Nevada Supreme Court ruled that Bradford's petition was procedurally barred under state procedural rules:

> Appellant filed his petition on May 4, 2012, more than two years after this court issued the remittitur from his direct appeal on December 15, 2009. Bradford v. State, Docket No. 50630 (Order of Affirmance, June 30, 2009). Thus, appellant's petition was untimely filed. See NRS 34.726(1). Moreover, appellant's petition was successive because he had previously filed a post-conviction petition for a writ of habeas corpus [footnote: Bradford v. State, Docket No. 58529 (Order of Affirmance, July 23, 2013)], and it constituted an abuse of the writ because he raised claims new and different from those raised in his previous petition. See NRS 34.810(1)(b)(2); NRS 34.810(2).

Order of Affirmance, Ex. 174, at 1, ECF No. 42-3. The Nevada Supreme Court went on to rule that Bradford did not show cause and prejudice, actual innocence, or any other ground to overcome the procedural bars. See id. at 1–4. The Nevada Supreme Court, therefore, affirmed the denial of Bradford's second state habeas petition on state procedural grounds. And, similarly, on the appeal in Bradford's third state habeas action, the Nevada Court of Appeals ruled Bradford's petition to be time-barred and successive under state procedural rules:

> Appellant Julius Bradford filed his petition on August 29, 2014, more than four years after issuance of the remittitur on direct appeal on December 15, 2009. Bradford v. State, Docket No. 50630 (Order of Affirmance, June 30, 2009). Thus, Bradford's petition was untimely filed. See NRS 34.726(1). Moreover, Bradford's petition was successive because he had previously filed two postconviction petitions for a writ of habeas corpus, and it constituted an abuse of the writ as he raised claims new and different from

8

>those raised in his previous petitions. [Footnote: <u>Bradford v. State</u>, Docket No. 61559 (Order of Affirmance, October 16, 2014); <u>Bradford v. State</u>, Docket No. 58529 (Order of Affirmance, July 23, 2013).] <u>See</u> NRS 34.810(1)(b)(2); NRS 34.810(2).

Order of Affirmance, Ex. 197, at 1, ECF No. 62-15. The Nevada Court of Appeals went on to rule that Bradford did not show cause and prejudice, actual innocence, nondisclosure of information by the State, or any other ground to overcome the procedural bars. <u>See</u> <u>id</u>. at 1–7. Therefore, the Nevada Court of Appeals affirmed the denial of Bradford's third state habeas petition on state procedural grounds.

Consequently, claims asserted by Bradford in his second or third state habeas action but not on his direct appeal or in his first state habeas action are subject to denial as procedurally defaulted, unless he can overcome the procedural default.

A petitioner can overcome a procedural default by making a showing of cause and prejudice. To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. <u>Murray</u>, 477 U.S. at 488. For cause to exist, the external impediment must have prevented the petitioner from raising the claim. <u>See</u> <u>McCleskey v. Zant</u>, 499 U.S. 467, 497 (1991). With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." <u>White v. Lewis</u>, 874 F.2d 599, 603 (9th Cir. 1989) (citing <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982)).

In <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012), the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause, to overcome the procedural default of a claim of ineffective assistance of trial counsel. In <u>Martinez</u>, the Supreme Court noted that it had previously held, in <u>Coleman</u>, that "an attorney's negligence in a postconviction proceeding does not establish cause" to excuse a procedural default. <u>Martinez</u>, 566 U.S. at 15. The <u>Martinez</u> Court, however, "qualif[ied] <u>Coleman</u> by recognizing a narrow exception: inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim

of ineffective assistance at trial." Id. at 9. A showing of cause and prejudice under Martinez consists of four elements: (1) the underlying claim must be "substantial;" (2) the "cause" for the procedural default consists of there being "no counsel" or only "ineffective" counsel in the state postconviction proceeding; (3) the state postconviction proceeding was the "initial" collateral review proceeding where the claim could have been brought; and (4) state law requires that the claim be raised in an initial collateral review proceeding, or by "design and operation" such claims must be raised that way, rather than on direct appeal. See Trevino v. Thaler, 569 U.S. 416, 423, 429 (2013). The failure to meet any of these four prongs renders the Martinez exception unavailable to excuse a procedural default.

To show that a claim is "substantial" under Martinez, a petitioner must demonstrate that the underlying ineffectiveness claim has "some merit." See Martinez, 556 U.S. at 14. That is, the petitioner must submit at least some evidence tending to show that trial counsel performed deficiently, and that the deficient performance harmed the defense. See Strickland v. Washington, 466 U.S. 668, 695–96 (1984).

Bradford argues that he can overcome the procedural default of his claims of ineffective assistance of trial counsel—including Ground 2—under Martinez.

B.      Standard of Review of Merits of Claims

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may not grant a petition for a writ of habeas corpus on any claim that was adjudicated on the merits in state court unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by United States Supreme Court precedent, or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. 28 U.S.C. § 2254(d). A state-court ruling is "contrary to" clearly established federal law if it either applies a rule that contradicts governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. See Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam). A state-court ruling is "an unreasonable application" of clearly established federal law under section 2254(d) if it

correctly identifies the governing legal rule but unreasonably applies the rule to the facts of the case. See Williams v. Taylor, 529 U.S. 362, 407–08 (2000). To obtain federal habeas relief for such an "unreasonable application," however, a petitioner must show that the state court's application of Supreme Court precedent was "objectively unreasonable." Id. at 409–10; see also Wiggins v. Smith, 539 U.S. 510, 520–21 (2003). Or, in other words, habeas relief is warranted, under the "unreasonable application" clause of section 2254(d), only if the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

With respect to a claim that the state courts did not address on its merits, the federal habeas court reviews such a claim de novo, rather than under the deferential AEDPA standard. See, e.g., Cone v. Bell, 556 U.S. 449, 472 (2009); Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011) ("When it is clear ... that the state court has not decided an issue, we review that question de novo.").

C. Ground 2

In Ground 2, Bradford claims that his federal constitutional rights were violated because his trial counsel was ineffective "for failing to advise Mr. Bradford that he faced the death penalty if he did not accept the state's plea bargain offers." Second Am. Pet. at 23–26, ECF No. 67.

Before the first trial in the Zambrano-Lopez case, the State offered Bradford a plea deal whereby Bradford would have pleaded guilty to second-degree murder with use of a deadly weapon and conspiracy to commit robbery in this case, the Zambrano-Lopez case, and second-degree murder with use of a deadly weapon and conspiracy to commit robbery in another case, the Limongello case, and the State would have recommended concurrent prison sentences with parole possible after twenty years. See Tr. of Proceedings, Ex. 49, at 13–15, ECF No. 25-6. Sean Sullivan, the attorney who represented Bradford at his first trial in the Zambrano-Lopez case, advised Bradford to accept the State's offer, but Bradford declined it. See id.; Second Am. Pet. at 24, ECF

No. 67; Decl. of Julius Bradford, Ex. 167, at 1, ECF No. 34-13. Bradford claims, though, that Sullivan did not sufficiently investigate the Limongello case before advising him about the plea offer, and that Sullivan did not advise him that if he declined the offer and was convicted in the Zambrano-Lopez case, the State could seek the death penalty in the Limongello case and could use the conviction in the Zambrano-Lopez case as an aggravating circumstance, and Bradford could be sentenced to death. See Second Am. Pet. at 24–25, ECF No. 67; Decl. of Julius Bradford, Ex. 167, at 1, ECF No. 34-13.

Bradford went to trial in the Zambrano-Lopez case and was convicted, and later he was charged with the Limongello murder, was tried in that case, and was convicted of first-degree murder; the conviction in the Zambrano-Lopez case was used as an aggravating circumstance in the Limongello case, and he was sentenced to death. See Judgment of Conviction, Ex. 165, ECF No. 34-11. The Nevada Supreme Court subsequently reversed Bradford's conviction in the Limongello case and remanded the case for a new trial; Bradford's retrial has not yet commenced. See Order of Reversal and Remand, Ex. 244, ECF No. 148-43. Bradford represents that the State is seeking the death penalty at the retrial. See Notice of Intent to Seek the Death Penalty, Ex. 223, ECF No. 148-22; Reply at 29, ECF No. 116. Bradford claims that, if he had been advised that there was a possibility that he could be sentenced to death in the Limongello case, he would have accepted the plea agreement offered by the State before the first trial in the Zambrano-Lopez case. See Second Am. Pet. at 26, ECF No. 67; Decl. of Julius Bradford, Ex. 167, ECF No. 34-13.

In Strickland, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption"

that counsel's representation was within the "wide range" of reasonable professional assistance. Id. at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. To establish prejudice under Strickland, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

The constitutional right to effective assistance of counsel in criminal proceedings extends to the plea-bargaining process. See Missouri v. Frye, 566 U.S. 134, 140–44 (2012); Lafler v. Cooper, 566 U.S. 156, 162 (2012). The Strickland standard applies. See Lafler, 566 U.S. at 162–63. In the context of plea bargaining, with respect to the performance prong of the Strickland standard, the habeas petitioner must show that his trial counsel did not adequately advise him such that he had "the tools he need[ed] to make an intelligent decision" regarding the plea offer. See Turner v. Calderon, 281 F.3d 851, 881 (9th Cir. 2002). With respect to the prejudice prong of the Strickland standard, the petitioner must show "that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Lafler, 566 U.S. at 163–64.

Bradford raised this claim for the first time in state court in his third state habeas action, see Second Am. Pet. at 23, ECF No. 67, and, as is discussed above, it was ruled procedurally barred in that action. Therefore, this claim is subject to dismissal as procedurally defaulted unless Bradford can show that some exception to the procedural default doctrine applies. Bradford argues that he can show cause and prejudice, such as

to excuse the procedural default under Martinez, because of ineffective assistance of his counsel in his first state habeas action. See Reply at 10–16, ECF No. 116.

The Court held an evidentiary hearing regarding this claim on June 11, 2021. At the evidentiary hearing, Bradford called Sullivan to testify, and Bradford testified himself. Respondents called Giancarlo Pesci to testify; Pesci was one of the prosecutors on the Zambrano-Lopez case when the plea offer was extended to Bradford prior to the first trial in that case.

Sullivan confirmed that when he represented Bradford he had not before acted as first-chair defense counsel in a murder trial. Sullivan testified that when the prosecution made the plea offer, seven to ten days before the first trial in the Zambrano-Lopez case, he, Sullivan, was aware of the Limongello case, knew that Bradford was a suspect in that case, and knew the prosecution was threatening to charge Bradford in that case. Sullivan confirmed that the prosecution's plea offer was to resolve both the Zambrano-Lopez case and the LImongello case, with concurrent sentences and parole possible after twenty years.

Before advising Bradford regarding the plea offer, Sullivan did not do any investigation regarding the Limongello case, other than following it in the media and having an investigator sit in on a preliminary hearing. Perhaps most importantly, Sullivan testified that he did not request from the prosecution, or otherwise obtain or view, any court filings in the Limongello case. Sullivan understood that he could have obtained such material and that it was highly relevant to his representation of Bradford but he chose not to obtain and review this crucial information. This information was crucial because at the time, two defendants had been charged in the Limongello case: Aaron Daniels and Natasha Barker. See Tr. of Prelim. Hearing, Ex. 203, ECF No. 148-2; see also Justice Court Records, Ex. 204, ECF No. 148-3. Also at the time, the file in the Limongello case included a notice of the State's intention to seek the death penalty against Daniels. See Notice of Intent to Seek Death Penalty, Ex. 205, ECF No. 148-4; see also Notice of Evidence in Support of Aggravating Circumstances, Ex. 207, ECF No. 148-6. There was

also at the time, in the Limongello case file, material indicating that it was Daniels' position that Bradford was involved in the Limongello murder, that witnesses would provide evidence that Bradford shot Limongello, and that video evidence showed Bradford using Limongello's ATM card shortly after his murder. See Motion for Additional Discovery, Ex. 208, ECF No. 148-7; Motion to Admit Evid. of Murder Committed by Julius Bradford and Others, Ex. 209, ECF No. 148-8; Transcript of Proceedings, December 30, 2003, Ex. 212, ECF No. 148-11. In short, it is plain from the record that even a cursory look at the court file in the Limongello case, at the time when the State extended the plea offer to Bradford, would have revealed that there was a significant possibility that Bradford would be charged with the Limongello murder, that there was significant evidence against Bradford for this murder and that the death penalty would be sought against him, but Sullivan did not take the simple investigatory step of obtaining and viewing the Limongello case court file before advising Bradford regarding the plea offer.

Sullivan admitted that he was, at the time, focused on trying his first murder trial. Sullivan did speak with Bradford a few times about the prosecution's offer. He admitted, however, that, while he did advise Bradford nominally to accept the prosecution's offer because of the unpredictability of trial, he emphasized to a greater degree with Bradford his confidence that Bradford would prevail at trial in the Zambrano-Lopez case. He therefore did not review substantively and carefully the details of the prosecution's offer and the consequences for Bradford if Bradford declined the offer.  Significantly, when Sullivan spoke with Bradford about the plea offer he did not discuss with Bradford the possibility that he could face the death penalty in the Limongello case. Given his inexperience at the time, Sullivan himself did not fully appreciate or understand that, if Bradford did not enter the plea deal and was convicted of murder in the Zambrano-Lopez case, that conviction could be used as an aggravating circumstance and the State could seek the death penalty against Bradford in the Limongello case.

Bradford took the stand at the evidentiary hearing and testified that before the first trial in the Zambrano-Lopez case, in March of 2004, the prosecution made the plea offer

15

to settle both the Zambrano-Lopez and Limongello cases. Bradford confirmed that the offer was for him to plead guilty to second-degree murder in both cases, and for the State to recommend sentences with parole possible after twenty years. At the time, he had just turned 19 years old, and had a 9th or 10th grade education. Bradford liked Sullivan and trusted him. Sullivan seemed confident about his chances in the Zambrano-Lopez case. Sullivan did not talk to him about the Limongello case at all. Sullivan did not review the possible charges, the evidence, or other consequences in the Limongello case for Bradford if he declined the offer. Rather, Sullivan suggested that Bradford did not have much to worry about with the Limongello case.

Sullivan advised Bradford to accept the prosecution's offer only because he was young and, under the offered plea agreement, he could get out of prison while still young. Sullivan did not, however, tell him what the maximum possible sentences would be if he was convicted of first-degree murder in both the Zambrano-Lopez and Limongello cases. Sullivan did not tell him that he could face the death penalty in the Limongello case. Sullivan did not explain that a murder conviction in the Zambrano-Lopez case could be used as an aggravating factor supporting imposition of the death penalty in the Limongello case. In fact, Sullivan did not mention the death penalty at all in their discussions about the plea offer.

Bradford testified credibly that if he had known that, if convicted in the Zambrano-Lopez case, the State could charge him in the Limongello case and seek the death penalty against him, he would have accepted the prosecution's plea offer without hesitation. The Court finds Bradford's testimony to be credible.

Pesci was the only witness presented by the Respondents; Pesci's testimony did not contradict the testimony of Bradford or Sullivan regarding the plea offer made to Bradford before the first trial in the Zambrano-Lopez case. Pesci did not recall whether or not Sullivan asked for materials regarding the Limongello case when the plea offer was under consideration, but Pesci testified that if Sullivan had asked, he would have provided him with those materials.

Bradford has made a compelling showing—and the Court finds—that Sullivan performed unreasonably as Bradford's counsel, because he did not sufficiently investigate the Limongello case before advising Bradford regarding the State's offer of a plea agreement, and because Sullivan did not advise Bradford that the State could seek the death penalty against him in the Limongello case. Sullivan did not understand, and did not advise Bradford, that a conviction in the Zambrano-Lopez case could be used as an aggravating circumstance in support of imposition of the death penalty in the Limongello case. Sullivan did not advise Bradford about the maximum prison sentences in each case, that he could face a death sentence in the Limongello case, and that entering the offered plea agreement could eliminate that possibility.

Bradford also made a compelling showing—and the Court finds—that Bradford was prejudiced by Sullivan's unreasonable performance in that there is a reasonable probability—a near certainty—that had he been advised that the State could seek the death penalty against him in the Limongello case, he would have accepted the State's offer and pleaded guilty under the resulting plea agreement, the plea agreement would have been presented to the court, and the court would have accepted its terms, resulting in convictions of second-degree murder instead of first-degree murder, resulting in less severe prison sentences, and removing the possibility of the death penalty in the Limongello case. The Court finds that Bradford was unaware of the possibility of a sentence of death in the Limongello case and how his conviction in the Zambrano-Lopez case could make that more likely.

Furthermore, the Court finds that Bradford's counsel in his state post-conviction habeas action was ineffective for not asserting this claim. The plea offer was on the record in this case. See Tr. of Proceedings, Ex. 49, at 13–15, ECF No. 25-6. It was unreasonable for Bradford's post-conviction counsel not to investigate the circumstances surrounding the plea offer and the advice that Bradford received from Sullivan regarding it. Sullivan testified that Bradford's post-conviction counsel did not contact him to inquire about the plea offer or any other aspect of the case. The Court finds that Bradford overcomes the

procedural default of this claim, under Martinez, allowing this Court to resolve the claim de novo. The Court will grant Bradford habeas corpus relief on Ground 2.

The writ of habeas corpus is "at its core, an equitable remedy." Schlup, 513 U.S. at 319. The Supreme Court has instructed:

> The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action. Its pre-eminent role is recognized by the admonition in the Constitution that: "The Privilege of the Writ of Habeas Corpus shall not be suspended * * *." U.S.Const., Art. I, § 9, cl. 2. The scope and flexibility of the writ—its capacity to reach all manner of illegal detention—its ability to cut through barriers of form and procedural mazes—have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.

Harris v. Nelson, 394 U.S. 286, 291 (1969). The equitable and flexible nature of habeas corpus relief is reflected in 28 U.S.C. § 2243, which authorizes federal courts to resolve habeas matters "as law and justice require." See Hilton v. Braunskill, 481 U.S. 770, 775 (1987). Federal courts thus have broad authority, in the context of the unique facts and circumstances of each case, to fashion a remedy tailored to the injury suffered from the constitutional violation. See Braunskill, 481 U.S. at 775; Nunes v. Mueller, 350 F.3d 1045, 1056–57 (9th Cir. 2003). "[A]ny habeas remedy should put the defendant back in the position he would have been if the Sixth Amendment violation never occurred." Nunes, 350 F.3d at 1057 (quoting United States v. Blaylock, 20 F.3d 1458, 1468 (9th Cir. 1994)).

Here, the Court's intention is to grant Bradford relief that will put him in the position he would be in had his counsel reasonably advised him regarding the plea offer made by the State prior to the first trial in the Zambrano-Lopez case, had he accepted that offer, and had the trial court approved it. This Court finds that, had he not received ineffective assistance of counsel, Bradford would now be convicted, upon guilty pleas, of second-degree murder with use of a deadly weapon and conspiracy to commit robbery in both the Zambrano-Lopez case and the Limongello case, and he would be serving concurrent prison sentences with parole possible after twenty years. Bradford seeks to have the Court issue a writ of habeas corpus "directing the State to reoffer him the global plea

deal." Pet's Prehearing Brief, ECF No. 150, at 28. The Court determines that the remedy requested by Bradford is appropriate, and that it should be adequate, and the Court will grant such relief. See Lafler, 566 U.S. at 162–75. If this relief proves to be inadequate to put Bradford in the position he would be in had he not received ineffective assistance of counsel, Bradford may make an appropriate motion to modify the judgment.

D.   Bradford's Other Claims

The Court determines that granting Bradford relief on Ground 2 renders moot his other claims in Grounds 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, and 17. The Court further determines that addressing those claims at this time is unnecessary and would only delay the grant of habeas relief to Bradford. Therefore, the Court will deny the remainder of Bradford's claims—the claims in Grounds 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, and 17—without prejudice, as moot.

E.   Certificate of Appealability

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also James v. Giles, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

The Court finds that, with respect to the claims on which the Court denies Bradford relief (without prejudice, as moot), applying the standard articulated in Slack, a

certificate of appealability is unwarranted. The Court will deny Bradford a certificate of appealability relative to those claims.

IV. **Conclusion**

**IT IS THEREFORE ORDERED** that Petitioner's Second Amended Petition for Writ of Habeas Corpus (ECF No. 67) is **GRANTED IN PART AND DENIED IN PART**. Petitioner is granted relief on his claim in Ground 2 of his second amended habeas petition. The Court denies relief, without prejudice, on all other claims in Petitioner's second amended habeas petition, as those claims are rendered moot by the grant of relief on the claim in Ground 2.

**IT IS FURTHER ORDERED** that Respondents shall, within 7 days from the date of this order, extend to Petitioner the same plea offer that he received before his first trial in the Zambrano-Lopez case and allow Petitioner at least 7 days to either accept or decline that offer.

**IT IS FURTHER ORDERED** that Petitioner is denied a certificate of appealability with respect to all claims on which the Court denies relief.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that, pursuant to Federal Rule of Civil Procedure 25(d), Calvin Johnson is substituted for William Gittere, as the respondent warden. The Clerk of the Court is directed to update the docket to reflect this change.

DATED: July 20, 2021.

_____
RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE